## THE SUSSEX RAILROAD COMPANY *vs.* THE MORRIS AND ESSEX RAILROAD COMPANY.

1. In a contract between companies owning connecting lines of railroad, for the continuous transportation of passengers and freight over both lines, it is lawful to agree upon a division of the fares, by which one company allows part of the fares earned on its line to the other company.

2. Such contract is valid as to future extensions of the road, even as to such as may be authorized by future legislation.

3. A contract made by a railroad company, which by its terms includes any future extensions of the road, will include in its operation not only such as were authorized by law at the making of the contract, but such as were authorized by subsequent legislation.

4. A contract between railroad companies using the same gauge, to transport passengers and freight continuously over both lines, does not imply a contract on the part of either company, that it will not change the gauge of its road.

VOL. IV.                               B

5. A bill for an account of fares received according to a contract previously made between the parties, is not technically a bill for specific performance, so as to induce a court of equity to refuse relief on the ground that the contract is inequitable.

The complainant and defendant, on the 24th of July, 1852, made a contract, under their seals. It recited that the complainant was about to re-construct its railroad between Waterloo and Andover, and to connect it with the railroad of the defendant, and to extend it to the village of Newton; and that the agreement was entered into for the mutual accommodation and benefit of the parties.

They agreed with each other, that all freight and passengers transported over the roads of either, or any future extensions or branches of the same, to the point of intersection, and destined for places at the termini or on the line of said roads, or any future extension or branches of the same, should be forwarded by the ordinary means of transportation on said respective roads, at the usual rates, and in no case at higher rates than charged to others.

The third article provided as follows: "That the settlement between the said companies shall be made monthly, and that the said Morris and Essex Railroad Company should allow and pay to the said Sussex Railroad Company, according to the provisions of the foregoing articles, thirty per cent. of the gross amount of the receipts of the said Morris and Essex Railroad Company for the transportation of all passengers passing on the roads of both said companies, and twenty-five per cent. of the gross amount of the receipts of said company for the transportation of all freight passing on the roads of both said companies, and also the same per centage of all deductions which shall be made to the Morris and Essex Railroad Company for said freight or passengers, by any other railroad company, from the ordinary charges of such other company over whose railroad the said passengers and freight may be transported. The said allowance and payment is not to be made, however, on

any passengers or freight which shall pass over the said Sussex Railroad for any distance less than two miles."

It provided that, for all freight transported over both roads, each should furnish its proportion of cars, according to its length from the intersection; and the defendant agreed to repair the locomotives of the complainant at cost, at defendant's repair shops, which were at Newark, the other end of its road.

The complainant agreed to complete and put in operation its road to Newton, by the first of January, 1855; and if it did not, the defendant could declare the contract void.

At the date of this contract, the defendant had completed its road from Newark to Dover, and was actually constructing the extension from Dover to Hackettstown. The passengers and freight on the road of the defendant were carried from Newark to New York by the New Jersey Railroad Company, at a deduction from the ordinary charges of that company.

The defendant at that time had, by a supplement obtained in 1836, to its charter granted in 1835, power to construct several branches or lateral roads, and by the eighteenth section of the supplement of 1851, to enter into contract with any corporation or individual, "for conveying passengers, goods, produce, merchandise, and other freight, between any point or points on the line of their road and the city of New York." By the first section of the last mentioned supplement, they were authorized to extend their road to the Delaware, at the Water Gap. That extension was never built.

After this contract, by the supplement of 1855, it was authorized to build a branch from Hackettstown to the Delaware, at Phillipsburgh, and by the supplement of 1857, to extend its road to the Hudson river; and was authorized to connect its roads, constructed or authorized, with any other railroad, upon any terms to be agreed upon, and to consolidate its said railroads with any other railroad.

The branch to the Delaware at Phillipsburgh, has since been built, as has also the extension from Newark to the

Hudson, by virtue of the supplement of 1857, and several other acts of the legislature. The complainant completed its road to Newton within the time stipulated in the contract; and since then the defendant has, at the monthly settlements, allowed and paid to the complainant the thirty per cent. of the amount received for transportation on the defendant's road, of passengers passing over both roads, and twenty-five per cent. of the amount paid for transportation of such freight on defendant's road; also the same per cent. of the deduction made by the New Jersey Railroad Company, while transporting such passengers and freight. But the defendant has refused to account for the amounts received for the transportation of such passengers and freight over the extension from Newark to the Hudson, and over the branch from Hackettstown to the Delaware, at Phillipsburgh; contending, that as these extensions were not authorized at the date of the contract, they were not in the contemplation of the parties, and are not included in the words "any future extensions or branches," in the contract.

The defendant has also recently changed the gauge of its track, by making it narrower than it was at the date of the contract, and than the track on the defendant's road, by means whereof the freight cars of the complainant could not pass over the road of the defendant; which the complainant contends is contrary to the spirit of the contract, and to an agreement to be implied from the provisions of the fourth article of the contract, regarding freight cars.

The bill is filed to compel the defendant to account for, and pay, the thirty and twenty-five per cent. of the amount received by the defendant for the transportation of passengers and freight passing over both roads, upon the extensions from Newark to the Hudson river, and from Hackettstown to Phillipsburgh; and also to compel the defendant to pay to the complainant the amount expended in widening its track and the gauge of its rolling stock or equipment, to correspond with the altered gauge of the road of the defendant.

The defendant, by its answer, admits the contract, and that complainant built its road to Newton, as required by it; that the defendant has built the extensions from Newark to Hoboken, on the Hudson river, and from Hackettstown to Phillipsburgh, and uses them, and has transported passengers and freight over them that has passed over both roads, two miles over each; and that it has accounted to complainant for the per centage on the amount received for such transportation on its road between Hackettstown and Newark, but that it has refused to account for such per centage on the amount received for such transportation beyond those places. And it contends that such is not the true meaning and effect of the contract.

The answer also contends, that such contract for a per centage on extensions not authorized, was beyond the power of the corporation, and void; and further, that a contract to pay a per centage of the tolls received on any part of the road, was a contract beyond the power of the corporation, and void.

The answer admits the alteration of the gauge, and contends that there is nothing in the contract that prevents altering the same at pleasure; that it was altered for the benefit of both companies and their common traffic, and that complainant knew of and approved the intention to alter it.

The cause was argued upon final hearing, on bill and answer.

*Mr. Frelinghuysen* and *Mr. McCarter*, for complainant.

*Mr. Vanatta*, for defendant.

The Chancellor.

The complainant asks relief on two distinct matters : the one, an account of the per centage or drawback on the tolls received for transportation upon the extensions beyond New-

ark and Hackettstown ; the other, indemnification for expenses incurred in altering the gauge of their track and rolling stock.

The defendant opposes the account on the grounds, that it is not within the meaning of the contract, and that if it is, the contract is void, as beyond the power of the corporation, both as to the agreement to allow such drawback on the tolls on the extensions, and on the road itself as then built or authorized.

First, as to the meaning of the contract. It expressly includes and covers by its terms, in the first article, " any future extensions or branches." These words include a future extension not then authorized, just as plainly as one that was then authorized.

When the words of a contract are plain, and there is nothing in the other parts of the contract or the subject matter of it, to control their ordinary meaning, the contract must be construed according to the settled meaning of the words. The words " future extensions," include both those then authorized and those that might be authorized. If one party had proposed to confine it only to future extensions " now authorized," and asked to insert those words, the other party who wished it to include all, would naturally expunge those words, and draft it so as to include " any " or " all" future extensions, as it is now drawn, without adding the awkward expletives " now authorized, or hereafter to be authorized." There is nothing in the other part of the contract to control or narrow the meaning of these words. There is nothing in the subject matter or in the situation of the parties or their business, to control their meaning ; on the contrary, the defendant was transporting passengers and freight to New York by contract with the New Jersey Railroad, in the deductions from which it agreed the complainant should participate, and had obtained power to contract for the transportation of freight and passengers from any point on the line of its road to New York ; the inference from which would be, that the extension to New York was

in the contemplation of the parties using these general words, as well as those already authorized. There is no authority, no reason or rule of construction, by which the words " now authorized " can be added by the courts to the words " future extensions or branches," used in the contract.

The next question is, had the defendant power to contract at all, or as to future extensions or branches? Contracts made by corporations must be within the powers granted to them by their charters and the laws, or they will be void, and cannot be enforced in this court.

The question before the court is, had the defendant power to make a contract with the complainant to divide the fare or tolls received for the transportation of passengers and freight over both roads, in the manner provided in this contract? It binds the defendant to pay a part of the tolls received for transportation of the common passengers and freight over its road to the complainant. These tolls or fare are what the defendant is entitled to receive and collect by virtue of its charter, and which the complainant could not receive or collect by any franchise of its own.

The power of a railroad corporation, chartered to construct and operate a railroad between designated termini, to engage or aid in constructing or operating any work beyond these termini, has been frequently discussed and adjudicated, both in English and American courts. It is well settled, that such corporation cannot contribute its capital or lend its credit to aid in the construction of works, auxiliary to its own line but beyond its limits. It cannot lease such auxiliary line, or guarantee its bonds, without authority by act of parliament in England, or in this country, in which the original contract between the stockholders cannot be altered by the legislative power alone, without an act of the legislature and the consent of the stockholders.

If this contract was to advance money to build complainant's road, or to guarantee its bonds, it would be clearly *ultra vires* and void.

But this is not a contract to do anything beyond the road

of the defendant, but only to transport passengers and freight upon it, and to fix the proportion in which the fare or tolls received for the transportation of passengers and freight passing over both roads shall be divided. The power depends upon a different principle. The counsel of the defendant, in his able and learned argument, endeavored to show that it was an appropriation of the moneys of the defendant to aid the complainant in building and maintaining its road; that it was a payment of moneys after they had been received by, and when they belonged to the defendant. The money having been received in the treasury makes no difference. The fair pro rata of roads running in connection is received by one of them at the terminus; but, by the agreement of partition, one share belongs to the co-operating line. So, in this case, although the defendant might receive the fare from New York to Newton, yet the pro rata beyond the junction, and the per centage or drawback, was received as the money of the complainant, and not as its own, and the payment was not paying over its own funds, but those of the complainant. The complainant receives one-half the fares for the common passengers and freight, and owns only one-fifth of the line, and at the monthly settlements will probably have to pay over to the defendant a surplus beyond its pro rata and per centage on common fares; and the validity of this contract cannot depend upon the result of the settlement, and whether the complainant retains the per centage, or gets it from defendant's treasury.

There is nothing in the statute concerning corporations to confine or limit the power of the defendants in this matter. By its charter, the corporation had the power to make by-laws, contracts, and agreements relating to the transportation of goods and passengers, and the charges to be made therefor. The *subject matter*, then, was within its power. Had the defendant, by by-law, resolution, or contract, agreed to carry a single passenger one trip for the compensation in this contract, that is, two-thirds of what it now charges, that would, without question, be within its power; that is a

Sussex Railroad Co. v. Morris and Essex Railroad Co.

contract with the person using, and having a right to use the road.

The question in this case is very different from that: it is whether the defendant can make a contract to endure for a year, or for the duration of its charter, with the complainant, to allow complainant one-third of the amount received from each passenger brought by complainant to defendant's road, or in any way to pay more than what was paid by the passenger for complainant's fare.

This question has been discussed in the English courts with great diversity of opinion among the judges, and perhaps cannot be considered as at rest there.

The English courts have for years been much inclined to keep corporations, especially railroad corporations, within the strict limits of the franchises granted to them, and to hold contracts void when exceeding these limits; especially when the application to restrain the corporation was made by a shareholder. Though they were inclined to "look with great disfavor on the objection of illegality of a contract urged by a party to that contract, for which he had received the consideration he had contracted for," as remarked by Sir John Romilly, in 16 *Beav.* 451.

The case of *Colman* v. *The Eastern Counties Railway Co.*, 10 *Beav.* 1, seems to be authority against such contract. The railway company proposed to enter into a contract with the Harwich Steam Packet Company, to run in connection, and to guarantee to the packet company five per cent. on its capital, and to pay the packet company, on its dissolution, the whole of its capital, upon a transfer of its assets. A shareholder of the railway company applied for an injunction against entering into such contract. Lord Langdale granted and continued the injunction; but this was done, not on the ground that the company had no power to agree as to a division of the profits from a common business, but because a guaranty of five per cent. profit on the packet line was a guaranty to support that undertaking, whatever it cost, and might absorb all the profits of the line, and because

the proposed contract would bind the defendant to pay the whole capital of the packet company expended, and assume its property.

In *Salomons* v. *Laing*, 12 *Beav.* 339, it was held that one company could not use its funds to buy shares of another company, to aid in constructing an auxiliary route.

In *Munt* v. *The Shrewsbury and Chester R. Co.*, 13 *Beav.* 1, it was held, that a railway company, having a terminus on a river, and authority to erect wharves there, could not use its funds to improve the navigation of the river leading to the wharf. These cases are not like the present, but they hold the principle, that a corporation is not warranted in transcending its powers, by the fact that doing so will be beneficial to its legitimate objects.

The case of *The Shrewsbury and Birmingham Railway Co.* v. *The London and North Western Railway Co.*, brought before the English courts, the question raised in this cause, whether railway companies could fix, by an arbitrary agreement, the proportions in which the proceeds of business common to both should be divided among them. The companies had made an agreement to buy off opposition to a parliamentary application by the defendants; that they would keep accounts of the traffic between certain points on the complainant's line and Rugby, and the points south of it, on the defendant's line, and divide these proceeds in the ratio of seven-thirteenths to the plaintiffs, and six-thirteenths to the defendants—an arbitrary proportion, not according to the amount of service performed.

The first decision in this case was by Vice-Chancellor Shadwell, reported in 14 *Jurist* 921. He sustained the demurrer to the bill, on the ground that the time for performance of the contract had not yet arrived, but expressed no opinion on the validity of the contract. Lord Chancellor Cottenham, in 1850, on the appeal from this decision of the Vice-Chancellor of England, reported in 2 *M. & G.* 324, overruled the demurrer, holding that the time for performance had arrived; and it being necessary that he should express

an opinion on the validity of the contract, held that it was a valid contract, saying, on page 353, " their duty to their subscribers was, as far as possible, to secure, by all lawful means, the most traffic they could get." Though applied to for that purpose, he did not refer the question to a court of law. But the complainant brought an action of covenant on the contract, in the queen's bench, and that court, in 1851, gave its opinion upon the question raised by demurrer, that the contract was valid. Lord Campbell delivered the opinion, in which the three other judges concurred. The case is reported in 17 *Q. B. R.* 652.

Lord Chancellor Truro, in an opinion delivered in 1850, reported in 3 *M. & G.* 70, on an application to dissolve an injunction granted by the Vice-Chancellor of England, places his decision dissolving the injunction, on the ground that the validity of the contract should be first decided at law, and carefully avoids giving any opinion on its validity.

Sir John Romilly, on the hearing of the cause at the Rolls, in 1852, 16 *Beav.* 441, dismissed the bill, being of opinion with the Vice-Chancellor of England, (contrary to that of Lord Chancellor Cottenham, reversing the Vice-Chancellor,) that the agreement had not yet taken effect; and he gives no opinion on the validity of the contract. On the hearing of the appeal from this decision at the Rolls, before the Lords Justices, 4 *DeG., M. & G.* 115, Lord Justice Knight Bruce gave no opinion on the validity of the contract, but holds it to be a gross wrong on the shareholders, and a breach of trust in the directors. Lord Justice Turner declared that, in his opinion, the contract was invalid.

When the case was heard on final appeal, in the House of Lords, 6 *H. L. Cas.* 113, Lord Chancellor Cranworth, in delivering the opinion in the case, does not give his own views on the legality of the contract. He seems to consider that the decision in the queen's bench, and of Lord Cottenham, gave the weight of authority in favor of its validity, but he held, with Sir Knight Bruce, that it was so inequitable that it should not be enforced in equity.

This case exhibits the contrariety of opinion among the English law and equity judges, and leaves the question undecided by authority there.

In *Hare* v. *The London and North Western Railway Co.*, decided by Vice-Chancellor Wood, in 1861, 2 *Johns. & Hem.* 80, the question was raised by a shareholder of the company. Two groups of railway companies, owning co-terminous routes, which competed for the same traffic, agreed to divide the profits of the whole traffic between themselves, in certain fixed proportions, being nearly the proportion that each had received before from the same traffic. The defendants, the London and Northwestern Railway Co., had, under this agreement, at one time paid over to the other companies £3800, or $19,000, of the fares received and earned by them on their own line within the preceding six months. And the Vice-Chancellor held that the agreement was valid, after comparing and considering the different opinions in the Shrewsbury case, their diversity, and their weight; yet he is by no means free from doubt.

In 1866, the question was again raised before Vice-Chancellor Kindersley in *The Midland R. Co.* v. *The London and North Western R. Co.*, 2 *Eq. Cas.* (*E. L. R.*) 524. This was on an agreement to divide the gross moneys of two competing routes, in a fixed proportion. The Vice-Chancellor held that the agreement did not directly, or by implication, include the business on a new route of the defendants obtained since the agreement. And he speaks of the opinion of Vice-Chancellor Wood, above referred to, as only intended to cover contracts as to existing routes, and expresses his opinion, though not free from doubt, that such contract as to traffic upon a railway which the company might thereafter be empowered to construct, was *ultra vires* and void. But he gives no reason for this doubting opinion, and places it upon no principle.

This is the state of the decisions in England, by the latest authorities brought to my notice, very contradictory and largely consisting of the mere impression or individual

opinion of the judge in the particular case, and, in the main, not based upon, or supported by, any settled principles of law, by which alone decisions can be made consistent.

I find no adjudication whatever in this country upon the point. Yet we know that it is, and has been for years, the constant practice of railway companies to run in connection, passing freight and passengers over a number of lines forming one route, and to divide the receipts by an arbitrary schedule fixed upon, and not always, or in most cases, giving to each line the share earned on it, and that only.

In many cases, as in the present, there may be good reasons for making a difference in division of the profits. If an advantageous arrangement can be made by a line at the south end of a route, with a line at the north end, for carrying passengers in common, which could not profitably (and therefore would not) be entered into by the north line, unless it received a larger proportion of the earnings than in proportion to its work, there is no reason or principle of law why the south line should be prohibited from making an arrangement profitable to its shareholders, on the ground that the division of earnings must be unequal.

The directors of such companies have the right to make contracts as to carrying passengers and freight. They can make such contracts for one trip, for one day, for one year, or for the whole existence of the company. They can make such contracts at prices lower than those limited in their charter, and lower than charged to others. The commutation contracts constantly made on all leading roads, are in exercise of this power. They are made for months, a year, and sometimes for life. Their validity is founded upon well settled principles of law, and has never been doubted. They are made for the supposed advantage of the business and of the shareholders; and the expediency of making them must depend on the judgment of some one, and in all these corporations, the management of *all the concerns* is committed to the directors. There is nothing in such contracts against

public policy, or any law of this state. The want of such power would be a great injury to most railway corporations, as well as to the public, who, as in this, are much benefited by the arrangement. Contracts, by which commuters are carried for less than cost, have been held good policy by railway managers, as tending to build up and populate towns along their line. They may misjudge as to the policy, but contracts thus made in good faith are valid.

I know of no principle of law or equity to support the doctrine of Vice-Chancellor Kindersley, that the directors of a railway company cannot make contracts as to business on lines not yet authorized.

There is no principle that would prohibit an individual from making contracts as to lands and buildings not yet bought or built, and the contracts made by the promoters of a railway line, while the project is before Parliament, and not yet authorized, are held, by the unanimous decisions of the English courts, to bind the company when incorporated.

In the case of *Willink* v. *The Morris Canal and Banking Co.*, this court held that the mortgage included the extension from Newark to Jersey City not then constructed, and the lands for which were not purchased. This decision was confirmed in the Court of Errors. And the Supreme Court of New York held, in *Seymour* v. *Can. and Niag. Falls R. Co.*, that a mortgage covered, and was a lien upon, a branch not contemplated or laid out at the time it was executed.

There is no reason why one railroad company should not agree with another to apply for a connecting route, and that, when authorized and constructed, it should be used in a manner agreed upon. These companies should have their powers and contracts construed and determined by the same rules that are applied to individuals. The English courts have taken a strong leaning of late years against the powers of corporations, and have indulged this tendency in many cases in which they merely declare their opinion that the acts are *ultra vires,* without referring to any principle, or

Sussex Railroad Co. *v.* Morris and Essex Railroad Co.

placing their decision upon any reason to govern its application in other cases.

I am of opinion, that the defendant has power to contract for carrying passengers and freight on the line of its road, and for the fares to be received therefor; that it can make such contract without any limit as to time, except the duration of its charter; and that it had power to make such contracts as to extensions and branches not authorized at the date of the contract.

I see no want of good faith toward their own stockholders by the directors in making this contract, so that it could be affected on the ground of fraud. It, at first view, seemed very unequal and unconscionable. It gave to complainant thirty per cent. of the passenger earnings of defendant, and we know, by authentic statements, that during the time for which this account is asked, the expenses of many of our leading lines have been from sixty to seventy per cent. of their gross earnings, thus giving to the complainant, as its share, all, or nearly all, the clear profits. But this was not so at the making of the contract; and the business of the complainant, whose road is short—not one-sixth of the common line—made a small addition to the trains of the defendant, and could be done with very little additional cost, so that the defendant might realize as much clear profit from the business brought to it by this contract, and which it would not have had without it, as it does on the business wholly its own. If this is so, the contract was an advantageous one to the defendant.

Whether the complainant receives more than it ought by this contract, is not the question of unconscionability; that depends upon whether it would have seemed greatly too much under the circumstances, when made. The directors of defendant should have got as good a contract as they could. I presume they did. They agreed to these terms, because they could not get better; and the complainant required them, because it was unwilling to expend its money on less favorable terms.

The defendant had, by the contract, the privilege of consolidating the stock of the complainant with its own, five years after the road was in operation. If complainant's contract was too advantageous, defendant had the right to absorb it by consolidation, placing itself in the situation where the complainant had placed itself by that contract. At the end of five years, defendant judged its own situation under the contract the best, and refused to consolidate; strong evidence that, up to that time, the amount allowed to complainant was not too much.

But the question here, does not depend upon the contract being beneficial, and it is not necessary to decide that it was. Nor is the want of equity in the contract a question here; it would be, if this was a bill to compel specific performance in the technical sense of that term. It is a suit to compel the defendant to account and pay, according to that contract; no more a suit for specific performance than one brought for an account between partners who have contracted to account.

As to the relief prayed, to compel the defendant to pay the expenses the complainant was put to in changing the gauge of its track, I do not see anything in the contract to found it upon. There is no express agreement as to the gauge, and I think none can be implied. The only part of the contract that can be used as an argument for such implication, is the provisions of the fourth article, which provides for each furnishing a due proportion of freight cars. But that will apply to the altered gauge, as well as to the former gauge. Neither party, probably, contemplated a change of gauge. But the defendant as probably did not contemplate restraining itself from changing the gauge, and, most probably, would have rejected such provision in the contract. It cannot, by implication, be held to have given up so important a franchise in a contract that contained nothing to bring the proposition to its consideration.